UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Teresa M. Graham,

        Plaintiff,

v.                                          Case No. 17-cv-2920 (JNE/SER)
                                                ORDER

Sgt. Shannon L. Barnette,
Officer Amanda Sanchez,
Officer Mohamed Noor,
and the City of Minneapolis,

        Defendants.

Defendant police officers entered Plaintiff Teresa Graham's home and seized Graham so that she could be transported to the hospital for an involuntary mental health evaluation. Plaintiff filed this suit alleging constitutional violations under 42 U.S.C. § 1983 and bringing state law claims. Citing qualified, official, and statutory immunities, Defendant police officers and the City of Minneapolis moved for summary judgment.

For the reasons set forth below, the Court grants in part and denies in part Defendants' summary judgment motion. First, the Court finds that the officers are protected by qualified, statutory, and official immunities. Second, the Court sides with the weight of federal authority and concludes that seizures in the mental health context require probable cause. Third, the Court determines that the City of Minneapolis' policy on transport holds is facially invalid and that a reasonable juror could find that the officers implemented this unconstitutional policy when they seized Graham without probable cause. As a result, the motion is denied with respect to Count 5, which alleges

1

that the City of Minneapolis deprived Graham of her Fourth Amendment seizure rights by maintaining an unlawful transport hold policy.  The motion is granted in all other respects.

## BACKGROUND

Around 10 a.m. on May 25, 2017, Teresa Graham called 911 and reported that a man was smoking marijuana on a retaining wall behind her home.  A police officer arrived at Graham's address, saw no one, and did not follow up with Graham about her report.  Several hours later, Graham called the Fifth Precinct and left a voicemail for the Precinct's commander, Inspector Kathy Waite.[1]  In the voicemail, Graham complained that officers did not respond to her call that morning.  Graham also referenced an email she had sent earlier in the day to Inspector Waite, Minneapolis Mayor Betsy Hodges, and other local government officials about the Minneapolis police department's failure to respond to a "vulnerable adult report" Graham had made previously concerning her disabled brother.  Around 6 p.m., Lieutenant Dan May returned Graham's call to inform her that an officer had investigated Graham's report of the man in her backyard earlier that day.

At 6:11 p.m., Graham's cousin called 911 and reported that Graham called him at work and threatened him and his family.  Incident Detail Report No. 17-191155, ECF No. 95, Carter Decl., Ex. 2.  The 911 call taker summarized the call for the responding officers in a comment to the Incident Detail Report: "CLRS COUSIN WHO JUST

_____

[1] Graham explained that she had Inspector Waite's direct number because she had previously contacted her about other issues involving the Minneapolis police.

CALLED HIM AT WORK AND THREATENED HIM AND HIS FAMILY." *Id.* The

Incident Detail Report reflects comments entered by 911 call takers, police dispatchers,

and the responding officers about an ongoing incident. The call taker also noted that

Graham's cousin requested a welfare check on Graham and that Graham's mental health

diagnosis was unknown.

At 8:14 p.m., Officers Noor and Sanchez arrived at Graham's home to conduct a

welfare check. Sanchez recorded the encounter with her body camera. When Graham

answered the door, the officers explained that they were responding to a complaint that

she had threatened a family member. Graham grew agitated, demanded to know who

made the report, complained that she was being slandered and harassed, and asked the

officers to leave. After leaving Graham's home, the officers reported that they were

asked to leave before they were able to check Graham's welfare, but that she appeared

"AOK." Incident Detail Report No. 17-191155, ECF No. 95, Carter Decl., Ex. 2.

At 9:05 p.m., a 911 call taker reported that Graham had called 911 three more

times since the welfare check. Incident Detail Report No. 17-191393, ECF No. 95,

Carter Decl., Ex. 14. Graham first called 911 at 8:20 p.m. to complain about the officers

harassing her in retaliation for reporting a crime. The call taker described Graham during

her first call as agitated, aggressive, and not making sense. Approximately fifteen

minutes later, Sergeant Shannon Barnette returned Graham's call and the two spoke

briefly about Graham's concerns. At 8:40 p.m., Graham called 911, asking to be

transferred to the Edina police department.  Twenty minutes later, Graham again called

911 and requested to be transferred to the Edina police department.

Sergeant Barnette had previously interacted with Graham and was aware of "some

mental health history."  Barnette Dep., ECF No. 95, Carter Decl., Ex. 12.  Graham called

the Fifth Precinct a year or two earlier to request an investigation into her sister's death at

Abbott Northwestern Hospital.  Barnette worried about Graham's mental state since she

accused medical personnel of covering up the circumstances of her sister's death.

Around this time, Inspector Waite informed Barnette that Graham had a mental health

history and had been subject to harassment restraining orders that were sought by

Hennepin County government employees.  Barnette did not remember specifics.

Relying on the officers' interactions with Graham described above, Barnette

directed[2] Noor and Sanchez to place Graham in custody to transport her for an

emergency mental health evaluation under Minnesota's Civil Commitment and

Treatment Act ("MCTA").  At 9:05:53 p.m., dispatch reported: "PER SGT BARNETTE .

---

[2] The timing of Barnette's decision to place Graham in custody is disputed.  Barnette
stated that although she directed the officers to check on Graham at her home and
possibly place Graham in custody, she did not make the decision to seize Graham until at
Graham's home.  Graham disputes Barnette's claim given (1) the comments in the
Incident Detail Report, (2) Barnette's concession that she approved a police report stating
that Barnette ordered the hold before arriving at Graham's home and (3) Barnette's
concession that an ambulance was ordered before arriving at the home.  For these
reasons, the Court finds that, when viewing the record in the light most favorable to the
plaintiff, a reasonable factfinder could find that Barnette directed the officers to place
Graham in custody prior to arriving at Graham's home.  *See Gosney v. Reliable Life Ins.
Co.*, 293 F.3d 1052, 1053 (8th Cir. 2002).  Nevertheless, the Court's "reasonableness
inquiry extends . . . to those facts known to the officer at the precise moment the officers
effectuate the seizure."  *Schulz v. Long*, 44 F.3d 643, 648 (8th Cir. 1995).

. . OFCRS TO SIGN A HEALTH AND WELFARE HOLD ON THIS SUBJECT."

Incident Detail Report No. 17-191393, ECF No. 95, Carter Decl., Ex. 14.  A similar entry

was made at 9:06:11: "OFCRS TO SIGN HEALTHWELFARE HOLD PER 502," which

is Barnette's squad.  *Id.*

      Under the MCTA, an officer may place a person in custody under a health and

welfare hold and transport that person to "a licensed physician or treatment facility if the

officer has reason to believe . . . that the person is mentally ill . . . and in danger of

injuring self or others if not immediately detained."  Minn. Stat. § 253B.05 Subd. 2(a)

(2017).  The Minneapolis police department ("MPD") policy on transport holds

summarizes the authorizing statute.  The policy allows an officer to take a person with

mental illness into custody "if there is a reason to believe the person poses a threat to

himself or others."  7-1005 Transport Holds Policy, ECF No. 133, Kushner Decl., Ex. D.

The policy further directs that "[t]he threat does not have to be imminent."  *Id.*

      At 9:06:49 p.m., dispatch informed the officers that one of Graham's family

members had called to warn the Edina police department that Graham may fight with the

police.  *Id.*  Subsequently, dispatch reported that Barnette would support Noor and

Sanchez at Graham's home.  *Id.*

      Around 9:40 p.m., Barnette, Noor, and Sanchez arrived at Graham's home.

Before arriving, the officers reviewed the above-referenced Incident Detail Reports.  All

officers wore body cameras that recorded the encounter.  Graham opened the interior door

and left the storm door locked and shut.  Graham told the officers that she did not call

them for help, angrily demanded that the officers leave her property, and slammed the door. The officers described Graham as agitated, argumentative, and uncooperative.

Barnette removed the screen from the storm door to allow entry should Graham reopen the interior door. The officers told Graham that they would leave if she opened the door and allowed them to make sure that she was okay. Through the door, Graham told the officers that she was fine. Graham then called 911 to complain about the officers at her front door.

Eventually, Graham opened the interior door to her home. Barnette and Noor entered the home through the screenless front door and held Graham by each arm in an escort hold for about six minutes. Graham repeatedly told the officers that the hold was causing pain to pre-existing injuries in her left shoulder and wrist. The officers directed Graham to sit in a chair and released her arms when she complied. During the encounter, Graham did not physically resist or threaten harm, but she did criticize, insult, swear at, and threaten to sue the officers.

The paramedics arrived and escorted Graham to the ambulance. Once Graham was in the ambulance, Officer Sanchez completed the emergency transport hold application required by the MCTA[3] and provided the form to the paramedics. The officers listed the following reason to take Graham into custody: "Female continuously called 911 and per dispatchers female was verbally agitated and not making sense. [P]er

---

[3] "The peace or health officer shall make written application for admission of the person to the treatment facility. The application shall contain the peace or health officer's statement specifying the reasons for and circumstances under which the person was taken into custody." Minn. Stat. § 253B.05 Subd. 2(a).

[Barnette], a hold was placed[d] on the female." Emergency Hold Application, ECF No. 133, Kushner Decl., Ex. B. Graham was then transported to Southdale Fairview Hospital and released after being examined by a doctor.

## DISCUSSION

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To support an assertion that a fact cannot be or is genuinely disputed, a party must cite "to particular parts of materials in the record," show "that the materials cited do not establish the absence or presence of a genuine dispute," or show "that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). In determining whether summary judgment is appropriate, a court views the record and all justifiable inferences in favor of the non-movant. *Liberty Lobby*, 477 U.S. at 255.

Defendants have moved for summary judgment on qualified immunity and related grounds. Discussed below are Graham's § 1983 claims against Sergeant Barnette and Officers Noor and Sanchez, her § 1983 claims against the City of Minneapolis, and her state law claims against all Defendants.

## I.     Section 1983 Claims Against the Officers

"On summary judgment, a defendant official is entitled to qualified immunity unless '(1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation.'"  *Walton v. Dawson*, 752 F.3d 1109, 1116 (8th Cir. 2014) (quoting *Howard v. Kan. City Police Dep't*, 570 F.3d 984, 988 (8th Cir. 2009)).  "District courts may consider these two questions in any order."  *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).  Where the law is not clearly established, courts may grant qualified immunity on that basis "without resolving the often more difficult question whether the purported right exists at all."  *Reichle v. Howards*, 566 U.S. 658, 664 (2012).

"To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent."  *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018).  It is not enough for the legal principle to be "suggested by then-existing precedent."  *Id.*  It must be settled law dictated by "'controlling authority' or 'a robust consensus of cases of persuasive authority.'"  *Id.* at 589-90 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741-42 (2011)).  Consequently, a reasonable officer should be able to interpret this precedent "to establish the particular rule the plaintiff seeks to apply."  *Id.* at 590.

The "clearly established" standard also requires "that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him."  *Id.*  The "'specificity' of the rule is 'especially important in the Fourth Amendment context.'"  *Id.*

(quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam)).  The Supreme Court has repeatedly stressed that courts should not "define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced."  *Id.*  (quoting *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014)).  Accordingly, courts should "identify a case where an officer acting under similar circumstances as [Defendant officers] was held to have violated the Fourth Amendment."  *Johnson v. City of Minneapolis*, 901 F.3d 963, 971 (8th Cir. 2018) (quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017)).  While the case need not be "'directly on point,' existing precedent must place the lawfulness . . . 'beyond debate.'"  *Wesby*, 138 S. Ct. at 590 (quoting *al-Kidd*, 563 U.S. at 741).

Graham alleges several constitutional violations.  Graham asserts several claims under the Fourth Amendment against the officers: (1) they entered her home without exigent circumstances; (2) they lacked probable cause to seize her for a mental health evaluation; and (3) they used excessive force in the process.  Graham also claims that the officers violated her Fourteenth and Fourth Amendment rights when they forced their entry and damaged her front door.  Additionally, Graham alleges that the officers conspired to violate her Fourth Amendment rights.  Finally, Graham claims that the officers retaliated against her exercise of her free speech right to complain about police actions.

The officers assert that they are entitled to qualified immunity on all claims.

**A.      Warrantless Entry**

Graham claims that the officers' warrantless entry into her home violated her Fourth Amendment rights.  Warrantless entry into the home without consent or exigent circumstances is presumptively unreasonable.  *Groh v. Ramirez*, 540 U.S. 551, 559 (2004).  The "emergency aid" and "community caretaking" exceptions are two such exigent circumstances.  These exceptions are "similar in nature, but not identical."  *Burke v. Sullivan*, 677 F.3d 367, 371 (8th Cir. 2012).  Under the "emergency aid" exception, officers may enter a home without a warrant when they have an "objectively reasonable basis for believing . . . that a person within the house is in need of immediate aid."  *United States v. Quarterman*, 877 F.3d 794, 797 (8th Cir. 2017) (quoting *Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (per curiam)).  Under the "community caretaking" exception, police officers perform community caretaking functions "to ensure the safety of the public and/or individual, regardless of any suspected criminal activity."  *Winters v. Adams*, 254 F.3d 758, 763 (8th Cir. 2001).  As community caretakers, officers may enter a home without a warrant when "the officer has a reasonable belief that an emergency exists requiring his or her attention."  *United States v. Quezada*, 448 F.3d 1005, 1007 (8th Cir. 2006).  The reasonable belief standard "is a less exacting standard than probable cause."  *Burke*, 677 F.3d at 371.

Although Graham argues that the emergency aid exception applies to the officers' entry into her home, the Court finds that the community caretaking standard is appropriate since the officers entered the home on a welfare check.  In *Burke*, the Eighth

Circuit applied the community caretaking exception to an officer's welfare check in the home.[4] *Id.* at 371-72. The Eighth Circuit found that an emergency requiring the officers' entry existed when the resident, who was "home alone with a violent suspect," did not respond after the officers attempted to contact her. 677 F.3d at 372. Similarly, the emergency in *Quezada* involved facts that would lead a reasonable officer to conclude that "someone was inside but was unable to respond for some reason." 448 F.3d at 1008.

Defendants contend that a mental health emergency justifies entry into the home. For example, in *Van Raden v. Larsen*, the court held that officers could enter the home to check on the welfare of a suicidal male, pursuant to their community caretaking function. No. CIV. 13-2283, 2015 WL 853592, at *1, *4 (D. Minn. Feb. 26, 2015). Defendants also cite *Winters* for the proposition that the community caretaking function includes acting out of concern for someone's mental condition. 254 F.3d at 760-63.

The community caretaking cases discussed above do not address whether Graham's conduct justifies entry into her home. In *Winters*, the officers observed a man acting erratically in his car—not in his home. *Id.* And although *Burke*, *Quezada*, and *Van Raden* did involve officers entering a home, these cases are distinguishable. This is not a case where officers believed someone in the home was unable to respond; Graham opened the door and told the officers to leave. There was no suicidal report; Graham did not threaten to harm herself. These differences are notable since the Supreme Court

---

[4] The Supreme Court has only applied the community caretaking doctrine to searches of automobiles. *See Colorado v. Bertine*, 479 U.S. 367 (1987); *South Dakota v. Opperman*, 428 U.S. 364 (1976); *Cady v. Dombrowski*, 413 U.S. 433 (1973).

generally affords heightened protection to the sanctity of the home.  *See Payton v. New York*, 445 U.S. 573, 585 (1980) ("[T]he physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.").  Because of these distinctions, it would not have been clear beyond peradventure that the facts of the present case justified the officers' warrantless entry into Graham's home.

"Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines."  *Davis v. Hall*, 375 F.3d 703, 712 (8th Cir. 2004) (quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)).  Because of the dearth of community caretaking cases, there are few bright lines and officers should not be faulted for guessing.  Here, the officers believed a mental health emergency existed because: (1) Graham had recently threatened her cousin on the phone; (2) Graham had repeatedly called 911 and appeared argumentative, agitated, and uncooperative; (3) Graham had a history of restraining orders; and (4) Graham's family member warned the police department that she may fight with officers.  Given these facts, Eighth Circuit precedent does not clearly establish—or even consider—whether an emergency existed that required officers to enter her home.  Accordingly, the officers are entitled to qualified immunity on Graham's warrantless entry claim.

**B.    Seizure for Mental Health Evaluation**

Graham argues that the officers did not have probable cause to seize her for a mental health evaluation.

## 1.     Clearly Established Right

The parties disagree as to what evidentiary standard is constitutionally required for seizures in the mental health context.  Because no clear standard applies to mental health seizures in the Eighth Circuit, the law is not clearly established.

Nine circuits have held that the Fourth Amendment requires an officer to have probable cause that the person seized is in danger of harming herself or others when detaining a person for emergency mental health evaluations.[5]   In 1992, the Fourth Circuit determined that "the general right to be free from seizure unless probable cause exists was clearly established in the mental health seizure context."  *Gooden v. Howard Cty.*, 954 F.2d 960, 968 (4th Cir. 1992) (collecting cases).  For support, this decision looked to an Eighth Circuit case, *Harris v. Pirch*, 677 F.2d 681 (8th Cir. 1982).  However, the standard used in *Pirch* is less explicit.  In *Pirch*, an officer seized the plaintiff at her home under the emergency provision of Missouri's civil commitment statute and the court held that the officer "had reasonable cause to believe that [plaintiff] had attempted to overdose."  *Id.* at 686.

---

[5] *See, e.g.*, *Myers v. Patterson*, 819 F.3d 625, 632 (2nd Cir. 2016) (requiring probable cause to seize a person for an emergency mental health evaluation); *Cantrell v. City of Murphy*, 666 F.3d 911, 923 (5th Cir. 2012) (same); *Roberts v. Spielman*, 643 F.3d 899, 905 (11th Cir. 2011) (same); *Cloaninger ex rel. Estate of Cloaninger v. McDevitt*, 555 F.3d 324, 334 (4th Cir. 2009) (same); *Meyer v. Bd. of Cty. Comm'rs of Harper Cty., Okla.*, 482 F.3d 1232, 1239 (10th Cir. 2007) (same); *Ahern v. O'Donnell*, 109 F.3d 809, 817 (1st Cir. 1997) (same); *Monday v. Oullette,* 118 F.3d 1099, 1102 (6th Cir. 1997) (same); *Sherman v. Four Cty. Counseling Ctr.*, 987 F.2d 397, 401-02 (7th Cir. 1993) (same); *Maag v. Wessler*, 960 F.2d 773, 775-76 (9th Cir. 1991) (same).

Defendants contend that the Court should instead apply the community caretaking doctrine to the officers' seizure. In *Samuelson v. City of New Ulm*, 455 F.3d 871, 877 (8th Cir. 2006), the court applied the community caretaking doctrine to a seizure. The court used the following reasonable belief standard:

> Whether the seizure of a person by a police officer acting in his or her noninvestigatory capacity is reasonable depends on whether it is based on specific articulable facts and requires a reviewing court to balance the governmental interest in the police officer's exercise of his or her "community caretaking function" and the individual's interest in being free from arbitrary government interference.

*Id.* In *Samuelson*, the officers "acted reasonably" when they decided to transport Samuelson, who was in the back of their police car, to the hospital for a mental health evaluation because they believed he was hallucinating. *Id.* at 874. The reasonable belief standard "is a less exacting standard than probable cause." *Burke*, 677 F.3d at 371.

For a legal principle to be clearly established, it must be a rule that "every reasonable official would know." *Wesby*, 138 S. Ct. at 590. Moreover, "precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Id.* Eighth Circuit precedent does not clearly establish a standard that every reasonable officer would know. Even if this Court finds *Harris* controlling,[6] it is unclear whether the "reasonable cause" standard is closer to the reasonable belief standard applied in *Samuelson* or the probable cause standard applied by other circuits. An officer should not be expected to interpret these conflicting

---

[6] "[W]hen faced with conflicting panel opinions, the earliest opinion must be followed 'as it should have controlled the subsequent panels that created the conflict.'" *Mader v. United States*, 654 F.3d 794, 800 (8th Cir. 2011).

opinions to clearly establish a rule requiring probable cause that the person seized is in danger of harming herself or others. Thus, the law is not clearly established, and the officers are entitled to qualified immunity on this claim.

**2.      Deprivation of a Constitutional Right**

Although Eighth Circuit law is not clearly established, nine other circuits apply the Fourth Amendment probable cause standard to seizures in the mental health context. The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. These circuit courts have analogized mental health seizures to a criminal arrest. *See e.g., Ahern v. O'Donnell*, 109 F.3d 809, 817 (1st Cir. 1997) (collecting cases). Because an involuntary hospitalization is no less a loss of liberty than an arrest, these courts have concluded that seizures in the mental health context must therefore be supported by probable cause. *Id.*

The Court sides with the weight of federal authority in concluding that the protection of probable cause adheres whether the seizure is for purposes of law enforcement or due to an individual's mental illness. The Court agrees with the Tenth Circuit's reasoning that:

> A person suspected of mental illness possesses a right to liberty and a right to freedom from unfounded charges of mental infirmity. Because a seizure of a person for an emergency mental health evaluation raises concerns that are closely analogous to those implicated by a criminal arrest, and both are equally intrusive . . . the 'probable cause' standard applies here . . . .

*Pino v. Higgs*, 75 F.3d 1461, 1468 (10th Cir. 1996).

Defendants urge the Court to apply the community caretaking standard of "reasonable belief." However, this lower standard would undermine constitutional protections guaranteed by the Fourth Amendment. Defendants provide no persuasive reason to deviate from the guidance of nine other federal circuit courts. Further undermining Defendants' argument, federal courts have even required probable cause in the community caretaking context. *See, e.g., Cloaninger ex rel. Cloaninger v. McDevitt*, 555 F.3d 324, 334 (4th Cir. 2009) (involving officer's "welfare check" at residence after a doctor's 911 call reported a possible suicide attempt); *Roberts v. Spielman*, 643 F.3d 899, 906 (11th Cir. 2011) (involving officer's "welfare check" at a residence after a relative called 911 to report a possible suicide attempt).

The MPD policy on transport holds permits police officers to seize individuals based on reasonable belief, a "less exacting standard than probable cause," *Burke*, 677 F.3d at 371. However, reading the Fourth Amendment and the MCTA in tandem, an officer must have probable cause that "the person is mentally ill . . . and in danger of injuring self or others if not immediately detained." Minn. Stat. § 253B.05 Subd. 2(a). Under this provision, a substantial likelihood of physical harm must be demonstrated by an overt act such as a recent attempt or threat to harm self or others. *Matter of McGaughey*, 536 N.W.2d 621, 623 (Minn. 1995); *see also* Minn. Stat. § 253B.02 Subd. 13(a)(iii). Accordingly, "speculation as to whether the person may, in the future . . . attempt or threaten to harm self or others is not sufficient to justify civil commitment." *McGaughey*, 536 N.W.2d at 623.

The proper inquiry is whether probable cause existed at the moment Graham was "seized" for evaluation. *Beck v. Ohio*, 379 U.S. 89, 91 (1964). Here, then, probable cause existed if "the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing" that Graham was in danger of injuring herself or others if not immediately detained. *Cf. id.* The Court concludes that there exists a genuine dispute of fact as to whether the officers seized Graham with probable cause.

The officers were understandably concerned about Graham's escalating agitation. After Officers Noor and Sanchez initially checked Graham's welfare, Graham called 911 three times in forty minutes. The 911 call taker in the first call described Graham as agitated and aggressive. Additionally, Sergeant Barnette knew that Graham had a mental health history and had been subject to harassment restraining orders in the past. Moreover, the officers were informed by Graham's family member that she may fight with police. For these reasons, the officers went to check on Graham's welfare a second time.

But even if the officers acted reasonably when checking on Graham's welfare, it does not follow that the officers had probable cause to seize her from her home and transport her to a hospital for a mental health evaluation. When the officers arrived at Graham's home, Graham's behavior did not necessarily eliminate concerns about her agitated mental state. Yet, her behavior did minimize concerns that Graham was in danger of harming herself or others if not immediately detained. The MCTA requires

that "a substantial likelihood of physical harm exists." *McGaughey*, 536 N.W.2d at 623. In the body camera footage, Graham appeared verbally hostile towards the officers, demanded the officers leave her property, and slammed her front door, but she did not threaten harm or physically resist. In fact, the only threat she made was that of a lawsuit. Agitation does not necessarily establish a likelihood of physical harm. Accordingly, a reasonable juror could find that the officers did not have probable cause that Graham was in danger of harming herself or others if not immediately detained.

Moreover, a reasonable juror could find that Graham's threat to her cousin was too speculative to justify a seizure. In *Kalberer v. Palmer*, the court held that the plaintiff did not pose a danger to himself or others, relying on the magistrate judge's conclusion that the officer merely believed that the plaintiff "could be dangerous" given his agitated mental state. No. CIV. 13-1665, 2014 WL 4540253, at *4 (D. Minn. July 31, 2014), *rev'd in part on other grounds*, 2014 WL 4540326, at *3 (D. Minn. Sept. 11, 2014). Speculation is not sufficient; the MCTA requires "a recent overt act, attempt or threat of harm to self or others." *Enberg v. Bonde*, 331 N.W.2d 731, 736 (Minn. 1983). Defendants attempt to distinguish *Kalberer* by arguing that Graham's threat to her cousin and his family establishes a substantial likelihood of physical harm. But even as Graham's agitation escalated, she remained inside her home, which greatly diminished the likelihood that her words—made three hours prior by phone—would lead to action. Defendants have not pointed to any other evidence corroborating Graham's intention or ability to carry out this threat if not immediately detained. Given the circumstances, a

reasonable juror could conclude that the reported threat,[7] by itself, did not establish probable cause that Graham's cousin was in imminent danger.

For these reasons, the Court concludes that a reasonable juror could find that the officers seized Graham without probable cause. The Court reiterates, however, that the officers are not faulted for simply following departmental policy, especially given the maze of conflicting standards discussed above. Accordingly, the officers are entitled to qualified immunity.

## C.  Excessive Force

Graham claims that the officers used excessive force. Defendants assert that they are entitled to qualified immunity because the officers used reasonable force. Claims of excessive force are analyzed under the Fourth Amendment and its reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989). The analysis focuses on whether the force applied is reasonable from the perspective of a reasonable officer on the scene at the time the force was used. *Chambers v. Pennycook*, 641 F.3d 898, 906 (8th Cir. 2011). The "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. The court looks to "whether the force used to effect a particular seizure is 'reasonable.'" *Pennycook*, 641 F.3d at 906. A

---

[7] The only information the officers had about the reported threat was the call taker's comment in the dispatch report, which stated: "CLRS COUSIN WHO JUST CALLED HIM AT WORK AND THREATENED HIM AND HIS FAMILY." Incident Detail Report No. 17-191155, ECF No. 95, Carter Decl., Ex. 2.

de minimis use of force, such as handcuffing, is insufficient to support a claim. *Id.*;

*Hunter v. Namanny*, 219 F.3d 825, 832 (8th Cir. 2000). In short, "[n]ot every push or

shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates

the Fourth Amendment." *Cook v. City of Bella Villa*, 582 F.3d 840, 849 (8th Cir. 2009)

(quoting *Graham*, 490 U.S. at 396).

The officers' escort hold constitutes de minimis force used to effectuate a transport

hold. Barnette and Noor each held Graham by one arm. The officers used de minimis

force to hold Graham's arms because she was confrontational and verbally aggressive

toward the officers and the officers were warned that Graham may fight with the police.

After Graham complained that the hold was causing pain, the officers let go of Graham

and directed her to sit in a chair. No reasonable officer would have understood the use of

the escort hold to constitute excessive force given the circumstances. Thus, the officers

are entitled to qualified immunity with respect to the excessive force claim.

## D.     Property Damage

Graham alleges that the officers violated her constitutional rights when they forced

entry into her home by removing and damaging her screen door. Defendants argue that

both the Fourteenth and Fourth Amendment property damage claims are barred by the

*Hudson* doctrine.

The Court agrees that Graham's Fourteenth Amendment claim is barred by the

*Hudson* doctrine. When challenging a property deprivation, "the claimant must either

avail himself of the remedies guaranteed by state law or prove that the available remedies

are inadequate." *Hudson v. Palmer*, 468 U.S. 517, 539 (1984). "When adequate remedies are provided and followed, no uncompensated taking or deprivation of property without due process can result." *Id.* Accordingly, the *Hudson* doctrine would bar Graham's claim since she has not alleged that state statutes or the Minneapolis claims process do not provide an adequate remedy for her property damage claims.

Graham contends that the *Hudson* doctrine does not bar Fourth Amendment claims.[8] Even assuming this is correct, the record does not establish a seizure under the Fourth Amendment. A Fourth Amendment seizure of property occurs when "there is some meaningful interference with an individual's possessory interests in that property." *Soldal v. Cook Cty.*, 506 U.S. 56, 61 (1992) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)). In *Porter v. Jewell*, 453 F. App'x 934, 937 (11th Cir. 2012), the Eleventh Circuit held that officers did not meaningfully interfere with the plaintiff's property interest where the damage to a door frame was "de minimis" and was repaired within an hour. Because the "damage was only a temporary deprivation of [plaintiff's] possessory interests," the court concluded that no seizure of property occurred. *Id.*

Here, officers did not meaningfully interfere with Graham's property. The officers removed the screen to effectuate their entry, but the record does not establish that the door was damaged beyond repair or that this damage was anything more than a temporary deprivation of her possessory interest. For this reason, there was no seizure of

---

[8] Many courts do not apply the *Hudson* doctrine to Fourth Amendment seizure-of-property claims. *Gilmore v. Dubuc*, No. CIV. 13-1019, 2015 WL 3645846, at *1 (D. Minn. June 10, 2015) (collecting cases).

Graham's property within the meaning of the Fourth Amendment.  Thus, Defendants are entitled to qualified immunity on this claim.

**E.    Conspiracy**

Graham alleges that the officers conspired to deprive her of her constitutional rights when they entered her home and seized her for an emergency mental health evaluation.  Defendant argues that this claim should be dismissed because Graham fails to establish a violation of her clearly established rights.

The Court holds that the officers violated Graham's Fourth Amendment seizure rights.  But even so, the conspiracy claim still fails.  To prove a conspiracy claim, a plaintiff must show: "(1) that the defendant conspired with others to deprive [her] of constitutional rights; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured the plaintiff." *White v. McKinley*, 519 F.3d 806, 814 (8th Cir. 2008).

Graham cannot demonstrate the first element, which requires "evidence of specific facts that show a 'meeting of minds' among conspirators."  *Barstad v. Murray Cty.*, 420 F.3d 880, 887 (8th Cir. 2005).  The record is completely absent of evidence, circumstantial or overt, purporting to show an agreement between any officer to deprive Graham of her constitutional rights.  Thus, summary judgment is warranted on Graham's conspiracy claim.

**F.**     **Retaliatory Arrest**

Graham alleges that the officers' entry and seizure were in retaliation for her constitutional free speech right to complain about police actions.  Defendants argue that this claim should be dismissed since Graham's seizure was supported by probable cause. As discussed above, the Court holds that the officers did not have probable cause. However, the Court dismisses this claim because the record does not show that the officers' decision to seize Graham was motivated by her speech.

Under Eighth Circuit precedent, there are four parts to a retaliatory arrest claim. The plaintiff must show: (1) "he engaged in a protected activity," (2) "the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity," (3) "the adverse action was motivated at least in part by the exercise of the protected activity," and (4) "lack of probable cause or arguable probable cause."  *Hoyland v. McMenomy*, 869 F.3d 644, 655 (8th Cir. 2017).  The third prong requires a plaintiff to show that the retaliatory motive was a "substantial factor" or "but-for cause" of the adverse action.  *Kopp*, 754 F.3d at 602.

Graham claims that the "temporal proximity" of the transport hold to her complaints about the officers indicates that the hold was "substantially motivated" by the speech.  Although "temporal proximity" is relevant to the determination, it is not dispositive.  *Id.* at 603.  The facts viewed in the light most favorable to Graham do not show that a retaliatory motive was a substantial factor in the seizure.  There is ample evidence in the record of the officers' concerns that Graham was having a mental health

emergency. A reasonable jury could not find that retaliatory animus was a substantial factor or but-for cause of the arrest. The officers are therefore entitled to qualified immunity on this claim.

## II.     Section 1983 Claims Against the City of Minneapolis

Graham alleges, first, in Count 5, that the City of Minneapolis' policy on transport holds is unconstitutional and, second, in Count 6, that the City's failure to properly train and supervise officers on the constitutional limitations of transport holds deprived her of her Fourth Amendment rights. Defendants seek summary judgment on Graham's *Monell* claims because she failed to establish a violation of her Fourth Amendment seizure rights. As discussed above, the Court disagrees. Consequently, the Court concludes that the City of Minneapolis' policy on transport holds is facially invalid and a reasonable juror could find that the officers implemented this unconstitutional policy when they seized Graham without probable cause.

"A plaintiff may establish municipal liability under § 1983 by proving that his or her constitutional rights were violated by an action pursuant to official municipal policy or misconduct so pervasive among non-policymaking employees of the municipality as to constitute a custom or usage with the force of law." *Ware v. Jackson Cty.*, 150 F.3d 873, 880 (8th Cir. 1998) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)) (internal quotation omitted). A municipality may be sued directly if it is alleged to have caused a constitutional tort through "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *City of St. Louis v.*

*Praprotnik*, 485 U.S. 112, 121 (1988) (quoting *Monell*, 436 U.S. at 691). Where a city's policy "in and of itself" is constitutionally invalid, the Supreme Court has clarified that "no evidence [is] needed other than a statement of the policy by the municipal corporation, and its exercise." *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 822-23 (1985) (plurality opinion). Moreover, "it requires only one application of a policy such as this to satisfy fully *Monell*'s requirement that a municipal corporation be held liable only for constitutional violations resulting from the municipality's official policy." *Id.* at 822.

Graham asserts that the MPD policy on transport holds is facially invalid for two reasons. First, the policy permits police officers to seize a person in the mental health context based on a reasonable belief, which is a lower standard than the constitutionally required standard of probable cause. In relevant part, the policy allows an officer to take a person with mental illness into custody "if there is a reason to believe the person poses a threat to himself or others." 7-1005 Transport Holds Policy, ECF No. 133, Kushner Decl., Ex. D. Second, the policy states that the threat "does not have to be imminent," 7-1005 Transport Holds Policy, ECF No. 133, Kushner Decl., Ex. D., which contradicts the MCTA statutory requirement that the person be in danger of harming self or others if "not immediately detained," Minn. Stat. § 253B.05 Subd. 2(a).

The Court agrees that the MPD policy is unconstitutional because the reasonable belief standard clearly contravenes the Fourth Amendment. As discussed above, federal case law overwhelmingly establishes that probable cause is required to seize someone in

the mental health context.  At this time, it is not necessary for the Court to address

Graham's second argument—that the policy violates the state statute.

To establish municipal liability under 42 U.S.C. § 1983 for the misconduct of an

employee, Graham must establish (1) a constitutional violation, and (2) that the

constitutional violation was committed pursuant to an official policy of a government

entity.  *Moyle v. Anderson*, 571 F.3d 814, 817 (8th Cir. 2009).  The Court has already

concluded that a reasonable juror could find that the officers seized Graham without

probable cause.  Given the fact that the MPD policy is facially invalid, it follows that a

reasonable juror could also find that the officers implemented this unconstitutional policy

when seizing Graham, and thus, the City of Minneapolis deprived Graham of her Fourth

Amendment rights by maintaining this unlawful policy.  In short, a reasonable juror could

conclude that the MPD policy is the "moving force of the constitutional violation."

*Monell*, 436 U.S. at 694.  Therefore, the Court denies Defendants' motion as to Count 5.

Alternatively, Graham argues that the City of Minneapolis failed to train

Defendant officers on the constitutional limitations of transport holds.  A municipality

may be subject to Section 1983 liability for inadequately training its employees where:

(1) its training practices were inadequate; (2) it was deliberately indifferent to the rights

of others in adopting them, such that the failure to train reflects a deliberate or conscious

choice; and (3) the alleged deficiency in its training procedures caused plaintiff's injury.

*Parrish v. Ball*, 594 F.3d 993, 997-98 (8th Cir. 2010).

Nothing in the record would enable Graham to meet "the rigorous, deliberate indifference standard of fault." *Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201, 1216 (8th Cir. 2013). Graham would need to demonstrate some municipal action or inaction, taken "with 'deliberate indifference' as to its known or obvious consequences." *Bd. of Cnty. Com'rs of Bryan Cnty., Okla. v. Brown,* 520 U.S. 397, 407 (1997). Graham does not allege that the failure to train reflects a deliberate or conscious choice to violate constitutional rights. Thus, summary judgment is warranted and Count 6 is dismissed.

## III.    State Law Claims

Third, Defendants seek summary judgment on the Minnesota state law claims. The Defendants argue that claims of false imprisonment, battery, assault, and negligence asserted against the officers are barred by statutory immunity under the MCTA and official immunity.

## A.    Statutory Immunity

The MCTA includes the following statutory immunity provision:

> All persons acting in good faith, upon either actual knowledge or information thought by them to be reliable, who act pursuant to any provision of this chapter or who procedurally or physically assist in the commitment of an individual, pursuant to this chapter, are not subject to any civil or criminal liability under this chapter.

Minn. Stat. § 253B.23 Subd. 4. All persons participating in the civil commitment process in good faith are immune from any civil or criminal liability, regardless of whether the detained person is actually committed. *Id*.; *Losen v. Allina Health Sys.*, 767 N.W.2d 703,

709 (Minn. Ct. App. 2009) (holding that the MCTA "encompasses the good-faith decision whether to place an emergency hold on a proposed patient, even if the result of that decision is that no hold is placed").  The grant of immunity provides complete immunity from suit.  *Dokman v. County of Hennepin*, 637 N.W.2d 286, 297 (Minn. Ct. App. 2001) (holding that police officers acting pursuant to Minn. Stat. § 253B.05 were entitled to qualified immunity).  The above analysis shows that the officers acted in good faith and on reliable information.  Thus, Defendant officers are entitled to immunity.

**B.      Official Immunity**

Under Minnesota law, a public official is entitled to official immunity from state law claims when the official's duties require the exercise of discretion or judgment. *Johnson v. Morris*, 453 N.W.2d 31, 41 (Minn. 1990).  Discretionary conduct is not protected if the act is malicious or in bad faith.  *Elwood v. Rice County*, 423 N.W.2d 671, 679 (Minn. 1988).  Graham argues that official immunity is unavailable as a defense because the officers' actions were not discretionary, and the officers acted with malice. The Court disagrees.

First, generally, police officers are discretionary officials.  *Morris*, 453 N.W.2d at 42.  A discretionary duty involves "individual professional judgment."  *Wiederhold v. City of Minneapolis*, 581 N.W.2d 312, 316 (Minn. 1998).  The officers' decision that an emergency existed, and that Graham was a danger to herself or others involves this kind of judgment.  *See Gooden*, 954 F.2d at 968 ("Certainly the concept of 'dangerousness' which calls on lay police to make a psychological judgment is far more elusive than the

question of whether there is probable cause to believe someone has in fact committed a crime.").

Second, "[i]n determining whether an official has committed a malicious wrong, we consider whether the official has intentionally committed an act that he or she had reason to believe is prohibited." *Hassan v. City of Minneapolis*, 489 F.3d 914, 920 (8th Cir. 2007). Viewing the facts in the light most favorable to Graham, the evidence does not show that Defendant officers acted in a way that they believed was prohibited by law. The record shows that the officers were acting in response to a perceived mental health emergency. Moreover, the officers could not have acted in a manner they believed to be unlawful since, as discussed above, the law was not clearly established. Therefore, the officers are entitled to official immunity.

Furthermore, "[v]icarious official immunity protects a governmental entity from liability based on the acts of an employee who is entitled to official immunity." *Dokman*, 637 N.W.2d at 297; *see also Pletan v. Gaines*, 494 N.W.2d 38, 43 (Minn. 1992) (finding official immunity for the municipality where the police officer received official immunity). Because the Court concludes that the officers are entitled to official immunity, the City of Minneapolis is entitled to vicarious official immunity.

## IV.    Expert Witnesses

Defendants also seek to exclude opinions of the two expert witnesses retained by Graham. There is no need to rely on these opinions to decide the motion for summary

judgment before the Court.  The Court will therefore deny the motion to exclude without

prejudice and allow Defendants to renew the motion closer to trial.

## CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT

IS ORDERED THAT:

1.      Defendants' motion for summary judgment [ECF No. 92] is GRANTED IN PART
        and DENIED IN PART as follows:

        a.      The motion is granted with respect to Counts 1-4 and 6-10 of the Complaint
                and these claims are DISMISSED WITH PREJUDICE.

        b.      The motion is denied with respect to Count 5.

2.      Defendants' motion to exclude expert opinions [ECF No. 117] is DENIED
        WITHOUT PREJUDICE.

Dated: December 14, 2018

                                                 s/ Joan N. Ericksen
                                                JOAN N. ERICKSEN
                                                United States District Judge